1    HARMEET K. DHILLON, ESQ. (SBN: 207873)
2    Harmeet@dhillonsmith.com
     KRISTA L. SHOQUIST, ESQ. (SBN: 264600)
3    kshoquist@dhillonsmith.com
4    DHILLON & SMITH LLP
     177 Post Street, Suite 700
5    San Francisco, California 94108
6    Telephone: (415) 433-1700
     Facsimile: (415) 520-6593
7

8    Attorneys for Plaintiff,
9    Torbit, Inc.

10                        UNITED STATES DISTRICT COURT

11                      NORTHERN DISTRICT OF CALIFORNIA

12

13                            San Jose Division

14

| | |
|---|---|
| 15  TORBIT, INC., a Delaware Corporation; | **Case Number:** |
| 16               Plaintiff, | **COMPLAINT** |
| 17 | |
| 18               v. | **1. Violations of Computer Fraud and Abuse Act (18 U.S.C. §1030)** |
| 19  DATANYZE, INC., a California | **2. Violations of Colorado's Uniform Trade Secrets Act (Col.Rev.Stat. §7-74-101 *et seq.*)** |
| 20  Corporation; and ILYA SEMIN, an | |
| 21  individual, | **3. Breach of Contract** |
| 22               Defendants, | **4. Breach of Duty of Loyalty** |
| 23 | **5. Trespass to Chattels** |
| 24 | |
| 25 | **Jury Trial Demanded** |

26        Torbit, Inc. ("Torbit"), by and through its attorneys, Dhillon & Smith LLP, files

27   this Complaint against Datanyze, Inc. ("Datanyze") and Ilya Semin ("Mr. Semin")

28   (collectively, "Defendants") and, upon information and belief, alleges as follows:

---

**Complaint**                              1                    **DHILLON & SMITH LLP**

1.     This is an action arising out of Defendants' illegal use of Torbit's confidential and proprietary business information, trade secrets and inventions during and following Mr. Semin's termination of employment with Torbit in April, 2012. Torbit brings claims for violations of the Computer Fraud and Abuse Act (18 U.S.C. §1030); violations of Colorado's Uniform Trade Secrets Act (Colorado Revised Statute §7-74-101 *et seq.*); breach of contract; breach of the employee duty of loyalty; and trespass to chattels.

## THE PARTIES

2.     Plaintiff Torbit, Inc. ("Torbit") is a Delaware corporation duly organized and existing under the laws of the State of California, with its principal place of business in Santa Clara County, California.

3.     Upon information and belief, Defendant Datanyze, Inc. ("Datanyze") is a California corporation duly organized and existing under the laws of the State of California, with its principal place of business in Santa Clara County, California.

4.     Defendant Ilya Semin ("Mr. Semin") is a former employee of Torbit who, upon information and belief, is a U.S. permanent resident who currently resides in Santa Clara County, California.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the federal Computer Fraud and Abuse Act pursuant to 18 U.S.C. §1030 and 28 U.S.C. §1331. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367, as they form part of the same case or controversy as the federal claim alleged herein, and under principles of pendent jurisdiction.

2.     This Court has personal jurisdiction over Datanyze because it is incorporated in California and transacts a substantial amount of business in this district, including certain acts complained of herein.

3.     This Court has personal jurisdiction over Mr. Semin because he is domiciled in this district; has conducted business in this district, including, *inter alia,*

---

1    entering into a contract for employment in this district; and has committed torts and

2    statutory violations in this district.

3        4.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because, *inter*

4    *alia*, a substantial part of the events giving rise to this lawsuit took place in this district.

5    **INTRADISTRICT ASSIGNMENT**

6        5.    Pursuant to Civil Local Rule 3-2(e), this case should be assigned to the San

7    Jose division of this Court because many of the claims alleged herein arose in Santa

8    Clara County.

9    **FACTUAL ALLEGATIONS**

10   **Mr. Semin And Torbit Enter Into An Employment Agreement**

11       6.    Torbit offers advanced performance optimization techniques that make

12   websites load faster, including by providing real user measurement and dynamic

13   content optimization solutions to its customers. Torbit helps its customers accurately

14   measure the performance of their website and quantify how speed impacts their

15   revenue.

16       7.    Mr. Semin was employed by Torbit as a developer from approximately

17   October 31, 2011 through April 27, 2012.

18       8.    The terms of Mr. Semin's employment with Torbit were set forth in an

19   Offer Letter dated October 4, 2011, which incorporated an Employee Proprietary

20   Information and Inventions Agreement (collectively, the "Agreement"). Mr. Semin

21   signed the Agreement on October 4, 2011, and began his employment with Torbit on

22   October 31, 2011. A true and correct copy of the Agreement is attached to this

23   Complaint as Exhibit A.

24       9.    By signing the Agreement, Mr. Semin agreed that during his employment

25   and thereafter, he would hold in the strictest confidence and not disclose, use or

26   publish any of Torbit's proprietary information ("Proprietary Information"), unless in

27   connection with his work for Torbit. The Agreement defined Proprietary Information

28   as follows:

---

**Complaint**                3                **DHILLON & SMITH LLP**

"any and all confidential and/or proprietary knowledge, data or information of [Torbit]...[including but not limited to] (a) trade secrets, inventions, mask works, ideas, materials, concepts, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques [defined as "Inventions"]; and (b) information regarding research, development, products, marketing and selling business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers and the existence of any business discussions, negotiations or agreements between [Torbit] and any third party, and (c) information regarding the skills and compensation of [Torbit's] employees, contractors or other service providers."

10.     By signing the Agreement, Mr. Semin further agreed that he would assign to Torbit any rights he may have or acquire in the Proprietary Information and would recognize that all Proprietary Information would be the sole property of Torbit and its assigns. He further agreed to obtain Torbit's written approval before publishing any material incorporating any Proprietary Information.

11.     By signing the Agreement, Mr. Semin agreed to assign to Torbit all his right, title and interest in and to any and all Inventions made or conceived or reduced to practice or learned by Mr. Semin during his employment with Torbit.  The Agreement incorporated an optional disclosure sheet by which Mr. Semin could identify any previous Inventions made by him prior to the commencement of his employment with Torbit, which Inventions would be outside the scope of the Agreement. Upon signing the Agreement, Mr. Semin indicated on the disclosure sheet that he had "no inventions or improvements."

12.     By signing the Agreement, Mr. Semin agreed that, during his employment with Torbit, he would not engage in any other employment or business activity which is competitive with Torbit or would otherwise conflict with his obligations to Torbit, without Torbit's express written permission. These obligations included refraining from soliciting the business of any Torbit client or customer in a

1   non-competitive manner, both during his employment and for one year thereafter, and

2   agreeing not to copy, delete or alter any of Torbit's information contained on Mr.

3   Semin's company computer or elsewhere.

4        13.     By signing the Agreement, Mr. Semin agreed that he would return all

5   Torbit documents and information, including Proprietary Information, to Torbit upon

6   the termination of his employee, and that he would not retain any copies of such

7   information.

8        14.     By signing the Agreement, Mr. Semin agreed that during his employment

9   with Torbit and for a period of one year after termination, he would promptly disclose

10   to Torbit all Inventions that he authored, conceived, or reduced to practice.

11     **Mr. Semin Steals Torbit's Trade Secrets, Proprietary Information, And Inventions**

12                **And Founds A Competing Company, Datanyze**

13        15.     One of Torbit's key internal tools is its confidential, proprietary Playbook

14   software ("Playbook"), which was designed to detect, monitor and record changes

15   made to websites in Torbit's industry. Playbook provides near real-time insight into

16   Torbit's market, enabling Torbit to better understand its market and competitors and

17   increase its sales intelligence.

18        16.     While other companies offer services that monitor general changes to

19   websites, Playbook's unique value stems from its focus on Torbit's specific industry

20   and services, such as Torbit's direct competitors, content delivery networks ("CDNs"),

21   domain name system ("DNS") providers, and JavaScript-based analytics tools.

22        17.     Playbook is Torbit's most valuable trade secret and one of its top

23   competitive advantages. Torbit has invested substantial effort and resources into

24   maintaining the secrecy of the Playbook concept, technology and source code to

25   prevent disclosure to third parties, including competitors.

26        18.     Mr. Semin worked on developing Playbook during his employment with

27   Torbit.

28

---

Complaint                  5             **DHILLON & SMITH LLP**

19.     During and following his employment with Torbit, Mr. Semin stole the proprietary Playbook concept, design, technology and functionality and made it commercially available to third parties through Datanyze, Inc., a company that he founded while still an employee of Torbit.

20.     There are numerous, striking similarities between the concept, technology, functionality and design of Playbook and the services and technology offered by Datanyze, including but not limited to the following:

- Playbook tracks changes that a website makes regarding its performance, such as the addition of a service like a content delivery network ("CDN") to improve site speed, so that Torbit can review the history of a domain to discover trends. Datanyze offers the same service to its customers;

- Playbook was built and designed around website-ranking data available through Alexa.com; Datanyze was built in the same fashion using the same service provider, despite countless alternative options;

- Playbook detects changes to a website – specifically, when a website adds or drops a performance-related service or technology – and sends email alerts to Torbit's sales team so that it may respond accordingly. Datanyze offers an identical service and functionality, and its website boasts the ability to send add/drop alerts to its customers, "signaling an opportune time to reach out to a prospect";

- Playbook was built and designed to integrate with Salesforce.com and its data product, Jigsaw, which allowed Torbit to gather more detailed information about each domain and the company behind it. Datanyze offers identical functionality;

- Playbook's functionality includes a feature called "tags" that enables Torbit to assess groups of websites and examine their shared properties. Datanyze offers the identical functionality, including the specific formatting of the tags and user interface.

21.     Datanyze's website states that its "crawlers" continuously examine websites to determine which web technologies are being used, and boasts that "Datanyze is the best tool for any web technology company to learn about both their prospects and current customers." Datanyze claims to provide "valuable insight into market dynamics," in the same manner as that provided by Playbook.

22.     Mr. Semin would not have had the knowledge or experience necessary to build the services or technologies offered by Datanyze without using the Proprietary Information he gained while employed by Torbit, including but not limited to the Playbook invention and source code. Mr. Semin stole these materials from Torbit and is using them without Torbit's permission.

23.     Upon information and belief, during and following his employment with Torbit, and without Torbit's authorization, Mr. Semin accessed Torbit's computers and computer networks and downloaded Torbit's code repository onto his personal computer, including Torbit's trade secrets, Proprietary Information and Inventions. Mr. Semin told at least one current Torbit employee about this conduct.

24.     Upon information and belief, Datanyze is fully aware that, in providing services and technologies to its customers, Datanyze is making unauthorized use of Torbit's Proprietary Information and Inventions, including but not limited to Playbook.

25.     In blatant disregard of his contractual obligations under the Agreement, Mr. Semin founded Datanyze during his employment with Torbit. While his termination date was April 27, 2012, Mr. Semin registered the domain name datanyze.com on or about March 18, 2012, and listed the founding date of Datanyze as April 1, 2012, on technology websites including Crunchbase.com. Mr. Semin subsequently and fraudulently modified the founding date to May 1, 2012. As reflected in the revision history for Datanyze available on Crunchbase's website, Mr. Semin made this modification on October 24, 2012 – mere days after a cease and desist letter

Complaint                                         7                         DHILLON & SMITH LLP

1  was delivered to him by Torbit, describing his tortious conduct and demanding that he

2  refrain from violating the Agreement and misusing Torbit's trade secrets.

## FIRST CAUSE OF ACTION

### Violations of Federal Computer Fraud and Abuse Act (18 U.S.C. §1030)

### (Against Mr. Semin)

6       26.     Torbit repeats and incorporates by reference each allegation in paragraphs

7  1 through 25 as if set forth fully herein.

8       27.     All of Torbit's computers are protected computers involved in interstate

9  commerce within the meaning of the Computer Fraud and Abuse Act, 18 U.S.C. §1030.

10      28.     Mr. Semin has violated the Computer Fraud and Abuse Act, 18 U.S.C.

11  §1030(a)(2)(C), by intentionally and without authorization accessing one or more

12  protected computers belonging to Torbit and by obtaining information from such

13  protected computers.

14      29.     Mr. Semin has violated the Computer Fraud and Abuse Act, 18 U.S.C.

15  §1030(a)(4), by knowingly, and with intent to defraud Torbit, accessing one or more

16  protected computers belonging to Torbit without authorization, and by means of such

17  conduct furthering the intended fraud and obtaining one or more things of value,

18  including but not limited to Torbit's proprietary Playbook Invention.

19      30.     By reason of Mr. Semin's misconduct, and pursuant to 18 U.S.C.

20  §1030(c)(4)(A)(i)(I), Torbit has suffered losses exceeding $5,000 within the year

21  preceding the filing of this complaint, including, without limitation, the cost of

22  responding to the unauthorized access and conducting a damage assessment, and safe-

23  guarding against further violations and unauthorized access by Mr. Semin.

## SECOND CAUSE OF ACTION

### Violation of Colorado's Uniform Trade Secrets Act

### (Col. Rev. Stat. §7-74-101 *et seq.*)

### (Against Both Defendants)

31.     Torbit repeats and incorporates by reference each allegation in paragraphs 1 through 30 as if set forth fully herein.

32.     Torbit possesses valuable, protectable trade secrets that afford it a competitive advantage in its industry, including but not limited to the Playbook concept, design, technology and source code. Torbit has taken substantial measures to prevent its trade secrets from becoming available beyond those to whom Torbit has given limited access. Prior to the conduct of Defendants as alleged in this Complaint, Playbook was not known outside of Torbit's business.

33.     Torbit disclosed its trade secrets to Mr. Semin during his employment at Torbit and pursuant to the Agreement, with the express understanding that all of Torbit's trade secrets were to be maintained in the strictest confidence by Mr. Semin during his employment with Torbit and thereafter.

34.     Mr. Semin understood that Torbit's trade secrets were to be used only for Torbit's benefit and only during his employment with Torbit, which terminated on April 27, 2012.

35.     During and following his employment with Torbit, and without Torbit's authorization, Mr. Semin deliberately and wrongfully accessed Torbit's computers and computer networks and misappropriated Torbit's trade secrets.

36.     Mr. Semin knew, or should have known, that he acquired Torbit's trade secrets by improper means.

37.     Mr. Semin and Datanyze are currently making use of Torbit's trade secrets, including but not limited to Playbook, without Torbit's consent, and have

---

1    disclosed those trade secrets to countless third parties, including Datanye's customers,

2    for the benefit of Mr. Semin and Datanyze.

3         38.    Datanyze knew, or had reason to know, that Mr. Semin acquired Torbit's

4    trade secrets improperly or under circumstances giving rise to a duty to either keep

5    them secret or to limit their use. By acting in concert with Mr. Semin, Datanyze has

6    deliberately and wrongfully misappropriated Torbit's trade secrets.

7         39.    Torbit is entitled to recover the damages it has sustained and will continue

8    to sustain as a result of Defendants' misappropriation of Torbit's trade secrets.

9         40.    Torbit is further entitled to recover from Defendants the amounts by

10   which Defendants have been unjustly enriched as a result of their trade secret

11   misappropriation. The amount of such damages shall be determined at trial, but are

12   believed at this time to exceed the sum of $800,000.

13        41.    Defendants' conduct constitutes willful and malicious misappropriation

14   pursuant to Col. Rev. Stat. §7-74-104(2) and §7-74-105, warranting the award of

15   exemplary damages and attorneys' fees and costs.

16        42.    Torbit will continue to suffer irreparable harm if Defendants' unlawful

17   misappropriation of Torbit's trade secrets is permitted to continue. Therefore, Torbit is

18   entitled to injunctive relief restraining Defendants and all persons acting in concert

19   therewith from the unauthorized use and disclosure of Torbit's trade secrets, including

20   but not limited to Playbook. Torbit is also entitled to a mandatory injunction requiring

21   Defendants to return the stolen trade secrets.

### THIRD CAUSE OF ACTION

**Breach of Contract**

**(Against Mr. Semin)**

43.    Torbit repeats and incorporates by reference each allegation in paragraphs

1 through 42 as if set forth fully herein.

44.     Torbit had a valid and existing Agreement with Mr. Semin, which included explicit confidentiality provisions designed and necessary to protect Torbit's confidential and Proprietary Information, trade secrets and Inventions.

45.     The Agreement obligated Mr. Semin to hold in the strictest confidence, and not disclose, use or publish any of Torbit's Proprietary Information, unless in connection with his work for Torbit. The Agreement further obligated Mr. Semin to return all Torbit documents and materials upon his termination and not to retain any copies of such information. The Agreement further obligated Mr. Semin to refrain from engaging in business activity which is competitive with Torbit and/or which conflicts with his obligations to Torbit, including after his termination.

46.     Torbit has performed all of its obligations under the Agreement other than those obligations whose performance is excused by virtue of Mr. Semin's breach of the Agreement.

47.     In breach of the Agreement, Mr. Semin made and retained unauthorized copies of Torbit's trade secrets, Proprietary Information and Inventions, and made unauthorized disclosure of that information to third parties, including by using and disclosing the Playbook concept and technology to Datanyze's customers.

48.     In breach of the Agreement, Mr. Semin founded a company and engaged in business activity which is competitive with Torbit and which conflicts with his obligations to Torbit.

49.     Mr. Semin has used and continues to use Torbit's trade secrets, Proprietary Information and Inventions for the benefit of himself and Datanyze, and to the detriment of Torbit.

50.     Torbit has been irreparably harmed as a direct and proximate result of Mr. Semin's unauthorized disclosure and use of Torbit's trade secrets, Proprietary Information and Inventions, which were shared with Mr. Semin pursuant to the Agreement.

51.     Torbit is entitled to recover the damages it has sustained and will continue to sustain as a result of Mr. Semin's breach of the Agreement. The amount of Torbit's monetary damages are to be determined at trial, but are believed at this time to exceed $800,000.

## FOURTH CAUSE OF ACTION

### Breach of Duty of Loyalty

### (Against Mr. Semin)

52.     Torbit repeats and incorporates by reference each allegation in paragraphs 1 through 51 as if set forth fully herein.

53.     As an employee of Torbit, Mr. Semin owed Torbit a duty of loyalty to act in Torbit's best interests and to put Torbit's interests ahead of his own.

54.     In breach of his duty of loyalty to Torbit, Mr. Semin accepted pay from Torbit and caused Torbit to repose trust in Mr. Semin while, at the same time, making unauthorized use of Torbit's trade secrets and spending his work time promoting his own new business, Datanyze, which was intended to and does unfairly compete with Torbit.

55.     As a direct and proximate result of Mr. Semin's breach of the employee duty of loyalty, Torbit has been damaged in an amount to be determined at trial, but at this time believed to exceed $800,000.

## FIFTH CAUSE OF ACTION

### Trespass to Chattels

### (Against Mr. Semin)

56.     Torbit repeats and incorporates by reference each allegation in paragraphs 1 through 55 as if set forth fully herein.

57.     Torbit owns and operates valuable chattels, including Torbit's computers and computer networks.

---

Complaint                                  12                    DHILLON & SMITH LLP

58.     Mr. Semin committed trespass to Torbit's chattels by intentionally accessing Torbit's computers and computer networks and downloading Torbit's confidential and Proprietary Information, trade secrets and Inventions, for his own use and/or Datanyze's use, without authorization.

59.     By Mr. Semin's willful and unauthorized conduct described above, Mr. Semin interfered with Torbit's use of its computers, computer networks, and confidential and proprietary business information.

60.     As a direct and proximate result of Mr. Semin's willful trespass, Torbit has been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Torbit prays for judgment against Defendants as follows:

1.      For actual and consequential damages in an amount to be determined at trial, but believed at this time to exceed $800,000;

2.      For a mandatory injunction requiring Defendants to return the trade secrets, Proprietary Information and Inventions stolen from Torbit;

3.      For an injunction preventing Defendants from using Torbit's trade secrets, Proprietary Information and Inventions in any unlawful manner, including to unfairly compete against Torbit;

4.      For the imposition of a constructive trust upon Defendants' ill-gotten gains as a result of the tortious activities detailed above;

5.      For exemplary damages for Defendants' misconduct pursuant to Col. Rev. Stat. §7-74-104(2);

6.      For reasonable attorneys' fees relating to Defendants' trade secret misappropriation pursuant to Col. Rev. Stat. §7-74-105;

7.      For costs of suit; and

8.      Such other and further relief as this Court deems just.

**DEMAND FOR JURY TRIAL**

Under Fed.R.Civ.P. 38(b), Plaintiff demands jury trial of all issues raised by the Complaint.

Date:  November 16, 2012

Dhillon & Smith LLP

By:

Harmeet K. Dhillon
Krista L. Shoquist
Attorneys for Torbit, Inc.

# EXHIBIT A

# T〜RBIT

*I.S.*

## OFFER LETTER FOR ILYA SEMIN

10/04/11

Dear Ilya Semin:

I am pleased to offer you a position with Torbit (the "Company"), as a Software Developer. If you decide to join us, you will receive an annual salary of $85,000, which will be paid monthly in accordance with the Company's normal payroll procedures. As an employee, you will also be eligible to receive certain employee benefits including reimbursement for a health plan (up to $200/month), free snacks and drinks and regular company lunches. You will also be eligible for health care through the Company once a formal Company health plan is adopted. You should note that the Company may modify job titles, salaries and benefits from time to time as it deems necessary.

In addition, if you decide to join the Company, it will be recommended at the first meeting of the Company's Board of Directors following your start date that the Company grant you an option to purchase 21,301 shares of the Company's Common Stock at a price per share equal to the fair market value per share of the Common Stock on the date of grant, as determined by the Company's Board of Directors. 25% of the shares subject to the option shall vest 12 months after the date your vesting begins subject to your continuing employment with the Company, and no shares shall vest before such date. The remaining shares shall vest monthly over the next 36 months in equal monthly amounts subject to your continuing employment with the Company. This option grant shall be subject to the terms and conditions of the Company's Stock Option Plan and Stock Option Agreement, including vesting requirements. No right to any stock is earned or accrued until such time that vesting occurs, nor does the grant confer any right to continue vesting or employment.

Also, we are offering you reimbursement of relocation expenses for your move to California, up to a maximum reimbursement of $5,000. The items for which we offer reimbursement are trips for you and your spouse to do a home search and payment for shipment of household goods. We will only reimburse for reasonable expenditures which are supported by valid receipts provided promptly to the Company.

The Company is excited about having you join and looks forward to a beneficial and productive relationship. Nevertheless, you should be aware that your employment with the Company is for no specified period and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice. We request that, in the event of resignation, you give the Company at least two weeks notice.

The Company reserves the right to conduct background investigations and/or reference checks on all of its potential employees. Your job offer, therefore, is contingent upon a clearance of such a background investigation and/or reference check, if any.

For purposes of federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated.

*I.S.*

We also ask that, if you have not already done so, you disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third party confidential information to the Company, including that of your former employer, and that in performing your duties for the Company you will not in any way utilize any such information.

As a condition of your employment, you are also required to sign and comply with an Employee Proprietary Information and Inventions Agreement which requires, among other provisions, the assignment of patent rights to any invention made during your employment at the Company, and non disclosure of Company proprietary information. In the event of any dispute or claim relating to or arising out of our employment relationship, you and the Company agree that (i) any and all disputes between you and the Company shall be fully and finally resolved by binding arbitration, (ii) you are waiving any and all rights to a jury trial but all court remedies will be available in arbitration, (iii) all disputes shall be resolved by a neutral arbitrator who shall issue a written opinion, (iv) the arbitration shall provide for adequate discovery, and (v) the Company shall pay all but the first $125 of the arbitration fees. Please note that we must receive your signed Agreement before your first day of employment.

To accept the Company's offer, please sign and date this letter in the space provided below. If you accept our offer, your first day of employment will be 10/31/11. This letter, along with any agreements relating to proprietary rights between you and the Company, set forth the terms of your employment with the Company and supersede any prior representations or agreements including, but not limited to, any representations made during your recruitment, interviews or pre employment negotiations, whether written or oral. This letter, including, but not limited to, its at-will employment provision, may not be modified or amended except by a written agreement signed by the President of the Company and you. This offer of employment will terminate if it is not accepted, signed and returned by 10/06/11.

We look forward to your favorable reply and to working with you at Torbit.

Sincerely,

Agreed to and accepted:

Josh Fraser
CEO, Torbit

Signature: _F. Semin_

Printed Name: _Ilya Semin_

Date: _10/04/11_

Enclosure: Employee Proprietary Information and Inventions Agreement

*I.S.*

**TORBIT, INC.**

## EMPLOYEE PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

In consideration of my employment or continued employment by **TORBIT, INC.** (the "**Company**"), and the compensation now and hereafter paid to me, I hereby agree as follows:

1. **NONDISCLOSURE.**

   1.1 **Recognition of Company's Rights; Nondisclosure.** At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that incorporates any Proprietary Information and/or disparages the Company. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information will be the sole property of the Company and its assigns. Notwithstanding anything contained herein to the contrary, nothing in this Agreement is intended to prohibit me from discussing with other employees, or with third parties who are not competitors of the Company, my wages, hours, and other terms and conditions of employment.

   1.2 **Proprietary Information.** The term "**Proprietary Information**" means any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "**Proprietary Information**" includes (a) trade secrets, inventions, mask works, ideas, materials, concepts, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "**Inventions**"); and (b) information regarding research, development, products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers and the existence of any business discussions, negotiations or agreements between the Company and any third party; and (c) information regarding the skills and compensation of the Company's employees, contractors or other service providers.

   1.3 **Third Party Information.** I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

   1.4 **No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

2. **ASSIGNMENT OF INVENTIONS.**

   2.1 **Proprietary Rights.** The term "**Proprietary Rights**" means all trade secret, patent, copyright, mask work, moral rights and other intellectual property rights throughout the world.

   2.2 **Previous Inventions.** Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on **Exhibit A** (Previous Inventions) attached hereto a complete list of all Inventions relevant to the subject matter of my employment by Company that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "Previous

*I.S.*

Inventions"). If disclosure of any such Previous Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Previous Inventions in **Exhibit A** but am only to disclose a cursory name for each such Previous Invention, a listing of the party or parties to whom it belongs and the fact that full disclosure as to such Previous Inventions has not been made for that reason. A space is provided on **Exhibit A** for such purpose. If no such disclosure is attached, I represent that there are no Previous Inventions. If, in the course of my employment with the Company, I incorporate a Previous Invention into a Company product, process or machine, the Company is hereby granted and will have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use, reproduce, make derivative works of, distribute, publicly perform, publicly display, import and sell such Previous Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Previous Inventions in any Company Inventions without the Company's prior written consent. I also agree that I will not incorporate into any Company software or otherwise deliver to the Company any software code licensed under the GNU General Public License or any other open source license that would require the Company to make any public disclosure or general availability of source code owned, developed or distributed by the Company.

    **2.3**    **Assignment of Inventions.** Subject to Sections 2.4 and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "**Company Inventions.**" I hereby forever waive and agree not to assert any and all Proprietary Rights I may have in or with respect to a Company Invention.

    **2.4**    **Nonassignable Inventions.** I recognize that, in the event of a specifically applicable state law, regulation, rule, or public policy ("**Specific Inventions Law**"), this Agreement will not be deemed to require assignment of any invention which qualifies fully for protection under a Specific Inventions Law by virtue of the fact that any such invention was, for example, developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secrets and neither related to the Company's actual or anticipated business, research or development, nor resulted or was derived from work performed by me directly or indirectly for the Company. In the absence of a Specific Inventions Law, the preceding sentence will not apply.

    **2.5**    **Obligation to Keep Company Informed.** During the period of my employment and for one (1) year after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf or in which I am named as an inventor or co-inventor within one (1) year after termination of employment. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under the provisions of a Specific Inventions Law; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement relating to Inventions that qualify fully for protection under a Specific Inventions Law. I will preserve the confidentiality of any Invention that does not fully qualify for protection under a Specific Inventions Law.

    **2.6**    **Government or Third Party.** I also agree to assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by the Company.

    **2.7**    **Works for Hire.** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

    **2.8**    **Enforcement of Proprietary Rights.** I will assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My

2

$\mathcal{I.S.}$

obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my employment, but the Company will compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

**2.9    Further Assurances.**  In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Section 2 with the same legal force and effect as if executed by me.  I hereby waive, assign and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

**2.10    Presumption of Ownership.**  Due to the difficulty of establishing when an Invention is first conceived or developed, whether it results from access to the Company's actual or anticipated business or research or development, or whether it is a direct or indirect result or derivation of any work I perform for the Company, I hereby acknowledge and agree that ownership of all Inventions conceived, developed, suggested or reduced to practice by me, alone or jointly with others during my employment shall be presumed to belong to the Company and I shall have the burden of proof to prove otherwise.

**3.    RECORDS.**  Unless otherwise directed or requested by the Company, I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all Proprietary Information developed by me and all Inventions made by me during the period of my employment at the Company, which records will be available to and remain the sole property of the Company at all times.

**4.    NO CONFLICTS OR SOLICITATION.**  I acknowledge that during my employment I will have access to and knowledge of Proprietary Information.  To protect the Company's Proprietary Information, I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any other employment or business activity which is competitive with the Company, or would otherwise conflict with my obligations to the Company.  For the period of my employment by the Company and continuing until one (1) year after my last day of employment with the Company, I will not (a) directly or indirectly induce any employee, independent contractor or consultant of the Company to terminate or negatively alter his or her relationship with the Company (b) solicit the business of any client or customer of the Company (other than on behalf of the Company) in any manner that is competitive with the Company or (c) induce any supplier, content provider, vendor, consultant or independent contractor of the Company to terminate or negatively alter his, her or its relationship with the Company.  If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it will be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

**5.    NO CONFLICTING OBLIGATION.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any non-compete agreement or any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company.  I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

**6.    RETURN OF COMPANY DOCUMENTS.**  When I leave the employ of the Company or upon request by the Company during the course of my employment, I will deliver to the Company any and all property, equipment, drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of Company.  I agree that I will not copy, delete or alter any information contained on my Company computer before I return it to Company.  I further agree that any property situated on Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement.

**7.    LEGAL AND EQUITABLE REMEDIES.**  Because my services are personal and unique and because I may have access to and become acquainted with the Company's Proprietary Information, the Company has the right to

*I.S.*

enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

**8.**     **NOTICES.** Any notices required or permitted hereunder will be given to the appropriate party at the address specified below or at such other address as the party may specify in writing. Such notice will be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

**9.**     **NOTIFICATION OF NEW EMPLOYER.** In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

**10.**     **GENERAL PROVISIONS.**

    **10.1**     **Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the State of Colorado, without regard for its conflicts of law principles that would require application of the laws of a different state. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Denver, Colorado for any lawsuit filed there against me by Company arising from or related to this Agreement.

    **10.2**     **Severability.** In case any one or more of the provisions contained in this Agreement is, for any reason, held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Notwithstanding the foregoing, if any one or more of the provisions contained in this Agreement is held to be excessively broad as to duration, geographical scope, activity or subject, for any reason, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it then appears.

    **10.3**     **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

    **10.4**     **Survival.** The provisions of this Agreement will survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

    **10.5**     **Employment.** I acknowledge and agree that my relationship with the Company is "AT-WILL", and that both the Company and I may terminate my employment relationship at any time, with or without cause or advance notice. I further agree and understand that nothing in this Agreement will confer any right with respect to continuation of employment by the Company, nor will it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause or advance notice.

    **10.6**     **Waiver.** No waiver by the Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement will be construed as a waiver of any other right. The Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

    **10.7**     **Entire Agreement.** The obligations pursuant to Sections 1 and 2 of this Agreement will apply to any time during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

    **10.8**     **Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT MAY NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

*I.S.*

**10.9 Export.** The export of technical data or products utilizing technical data to countries outside the United States could violate United States export laws or regulations. I agree that I will not export such data, directly or indirectly, unless I have specific authorization from the Company.

This Agreement is effective as of the first day of my employment with the Company, namely: _10 / 31_ , 2011.

I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

Dated: _10 / 04 / 11_

_I. Semin_
**(Signature)**

_Ilya Semin_
**(Printed Name)**

ACCEPTED AND AGREED TO:

TORBIT, INC.

By: _____

Title: _____

Address: _____

_____

_____

Dated: _____

5

IS

**Exhibit A**

**PREVIOUS INVENTIONS**

TO:        Torbit, Inc.

FROM:      _____

DATE:      _____

SUBJECT:   Previous Inventions

1.        Except as listed in Section 2 below, the following is a complete list of all Inventions relevant to the subject matter of my employment by Company that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "**Previous Inventions**"):

☒    No inventions or improvements.

☐    See below:

_____

_____

_____

☐   Additional sheets attached.

2.        Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐   Additional sheets attached.

A-1